UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re:<br><br>MELANIE A. CAMARA,<br><br>Debtor | )<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 7<br>Case No. 23-10010-CJP |
| JONATHAN TORRES,<br><br>Plaintiff<br><br>v.<br><br>MELANIE A. CAMARA,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | AP No. 23-1033-CJP |

**<u>MEMORANDUM OF DECISION</u>**

The plaintiff Jonathan Torres in the above captioned adversary proceeding seeks a declaration that he possesses an ownership interest as a result of an equitable or constructive trust in certain property owned of record by the debtor/defendant Melanie A. Camara ("Count I") and, alternatively, a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(a) and (a)(4) if Torres's interest is a claim against the debtor's estate ("Count II").[1] The Court conducted a trial on April 3, 2025 on the two count complaint, at which both Camara and Torres testified and eleven exhibits were admitted.[2]

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ *101 et seq.*, as amended (the "Bankruptcy Code" or "Code").

[2] *Affidavit of Jonathan Torres* [ECF No. 33] ("Exhibit 11"); *Affidavit of Melanie A. Camara* [ECF No. 34] ("Exhibit 10"); *Admitted Trial Exs. List* [ECF No. 41].

The parties have stated on the record that, if I find in favor of Torres on Count I by determining that the parties came to an agreement that Torres would have an ownership interest in the real property located at 68 Park Street, New Bedford, Massachusetts (the "Property"), Camara will be deemed both to possess an interest as a tenant in common and to hold bare legal title to the Property as to Torres's interest as tenant in common, such that Torres's equitable interest would not be property of Camara's bankruptcy estate under an actual, constructive, or resulting trust theory.  They have also agreed that I would not need to reach the § 523 claim of nondischargeability if I find in favor of Torres on Count I because there would be no debt held by Torres with respect to the Property that could be determined to be non-dischargeable because he would retain an ownership interest.

**Findings of Fact[3]**

Camara and Torres began dating in the summer of 2019.  Each had two minor children from prior relationships.  While they were dating, Torres rented and lived in a three-bedroom apartment with his children for approximately $800 per month and had lived in that apartment for eight years.  Camara and her children were living with Camara's mother at her mother's house.  Camara was attending nursing school, intending to graduate in 2020 and purchase a home when she commenced working as a nurse.

By March of 2020, the parties decided to cohabitate and combine their families in one home.  The parties discussed buying a home together that would be large enough for their

---

[3] Findings of fact are incorporated throughout the discussion in this decision. Any findings of fact that are, in whole or part, rulings of law shall be considered as such and vice versa. While I may cite to specific supporting evidence in the record, my findings are often supported by additional evidence in the record I have considered, and I do not intend to limit support for my findings to the cited portion of the record. Further, to the extent that I reference testimony or other evidence that supports my rulings, I have credited that testimony or other evidence even if I have not made an express finding. Where I have referenced testimony or other evidence that does not support my rulings, I have weighed that evidence, but it has not overcome the weight that I have given to other evidence in the record, whether explicitly referenced or not.

2

combined families. Eventually, the parties began looking together at houses that were for sale in the New Bedford area. Ultimately, the parties agreed to make an offer to purchase the Property. On or about September 4, 2020, Camara submitted a written offer to purchase the Property.

The evidence shows that Torres was involved in every step of the process to purchase the Property. He communicated with the broker, viewed the Property, and wrote a letter for Camara to submit to the seller to reiterate her interest given there were other parties who had submitted offers to purchase the Property. Ex. 1, at 13; Ex. 10, at ¶ 12. Torres and Camara had multiple communications regarding financing the purchase and the work that was needed to finish attic space to make the house most comfortable for their combined families. They each testified that Torres desired not to be a borrower "on the mortgage" because he believed that doing so would hamper his access to financing to purchase a "triple decker" property as he had hoped to do. Ex. 1, at 6.

Camara testified that it was always her intention "to be the only person on the mortgage," but that she "invited" Torres to see if he could pre-qualify for a mortgage because he "did not have great credit." Ex. 10, at ¶ 15. Ultimately, the evidence shows that the parties agreed that Camara would buy the Property and be obligated on the mortgage. I credit Torres's testimony that the parties intended that they would have equal ownership interests in the Property and would also equally contribute to costs of ownership, which is supported by the documentary evidence.

In a text exchange on May 20, 2020, the parties discussed their intentions:

5/20/2020 11:07 PM

Torres: I want to be a contributor into buying the house. I don't want you to think I don't just because I've been looking at SUV's.

Camara: I wasn't expecting you too contribute.

> Torres: I know. But I don't want the burden of a down payment to solely fall on you babe.
>
> Camara: Well if that's what you honestly want to do then that's fine but are we then doing the mortgage in both of our names because if not and it's going to be only in mine because you want a multi family then I would want to have a document drawn up saying that if you and I don't work out that we would sell the house and split the money or buy the other out. I wouldn't want you investing into something and not getting something in the end if we something was to happen. I would never do that to you but it's better safe than sorry.
>
> Torres: We can learn more about that stuff.
>
> Camara: We definitely need to. I just think it's only fair. I understand we both want to contribute to the house and if we will be splitting a mortgage it's the right thing to do. I hope you're ok with this. I have no attention of leaving you.
>
> Torres: I think we can split the mortgage without my name being on the mortgage. That way it doesn't interfere with me getting multi families. I think I can have my name on the deed. But like I said, I don't know how that stuff works babe. But we can figure it out.
>
> Camara: Sounds good. I really need to sleep. I'm going to be miserable tomorrow morning. Lol[.]

Ex. 1, at 5–6.[4]

On September 4, 2020, Camara and Torres exchanged text messages confirming with each other that they were ready to make the offer for the Property and that Torres was comfortable with the amount of his anticipated monthly contribution towards the mortgage payment:

> 9/4/2020 7:37 PM
>
> Camara: . . . But on a serious note I'm about to sign this. So are you 100% sure? Offer 307k with 7k towards closing cost and 3k cash deposit so mortgage loan would be 304k. Unless obvious appraisal is lower. You ready for this and ok with it??
>
> Torres: Yes. We are in this together and I will always work hard to do what ever I can for us to be stable.
>
> Camara: Well we will be fine. Even at 304k it would be about 650 each pay check and you said that's in your budget so I think we will be ok. I'm doing it now.

---

[4] The text messages have not been edited, unless otherwise noted.

4

> Torres: Ok. And yes, 650 is in my budget.
>
> Camara: The offer is good until 5pm sept 6th so we should know before then. [emojis omitted]

Ex. 1, at 15.

The offer required a $3,000 deposit. It is undisputed that Torres paid Camara $1,500 toward that deposit, which was later characterized as a "gift" in response to requirements of the mortgage broker. He also paid half of the home inspection fee. The parties texted each other:

> 9/7/2020 9:48 PM
>
> Camara: Well I have to make a certified bank check for 3k so not sure if you want to still go half or not and I can pay it all.
>
> Torres: Of course I'm going half.
>
> Camara: Ok then it's 1,500. Then on Saturday Mark said he takes check or credit card so not sure how you want to do that but that will be $177.
>
> Torres: Ok. Sounds good.

Ex. 1, at 20.

Ultimately, Camara obtained a down payment assistance loan and the $3,000 deposit was returned. While not entirely clear, evidence supports a finding that those funds were deposited into the parties' joint account that they had established to pay the mortgage and other expenses of the Property.

Prior to purchasing the Property, the parties researched and discussed different ways to jointly own a property. It is undisputed that Camara followed through on the parties' earlier discussions regarding joint ownership and how a property would be divided if the parties' relationship ended by drafting and presenting to Torres an "Equal Ownership Contract" (the "Agreement"), the form of which she obtained online. Ex. 5. Camara testified that the Agreement was her idea. Sometime in September of 2020, prior to purchasing the Property, the parties agreed to sign the Agreement before a notary. The parties discussed consulting a lawyer, but they did not. They were unable to meet with the notary prior to the closing, which occurred

5

on or about October 30, 2020. On November 3, 2020, Torres and Camara executed the Agreement before a notary.

In accordance with the Agreement, after the closing, the parties faithfully divided payment of the mortgage, utilities, and expenses to maintain the Property. Additionally, Torres gave a friend a car that he valued at approximately $1,000 in exchange for help building out the attic of the Property for a bedroom for his children. Torres and his friend performed the work, and Torres and Camara split the cost for the materials. Camara also paid approximately $900 for a fence. The parties regularly referred to the Property as "our" property.

The parties were engaged in May of 2021. Camara filed her chapter 7 petition on January 5, 2023. Camara ended her relationship with Torres in March of 2023, and Torres moved out of the Property on April 1, 2023. It is undisputed that Torres paid half of the mortgage, utilities, and expenses to maintain the Property until he moved out. He has not made any payments since.

In her schedules, Camara listed herself as the sole owner of the Property and initially did not identify Torres as a creditor or list him on her matrix. On April 7, 2023, Camara sought to amend Schedule E/F to add Torres as a nonpriority, general unsecured creditor holding a "potential claim" in an unknown amount. After moving from the Property, Torres contacted a lawyer and asserted rights under the Agreement for mediation and to be paid for his interest in the Property.

Camara testified that it was not her intention that Torres would have an interest until he was "put on the deed" for the Property. She stated Torres would not have an interest in the Property unless their relationship progressed. At another point in her testimony, she stated that the condition for Torres to be put on the deed was when he purchased a triple decker property.

6

She testified that she should have consulted a lawyer but that she never intended Torres to have an interest in the Property until he was named on the deed. She could not ever recall having a conversation with Torres to that effect. In her direct testimony affidavit, she stated that during the two and a half years that the parties lived together Torres never brought up being placed on the deed. Ex. 10, at ¶ 27. Torres testified that he brought it up at least twice and that it was "brushed off" or the parties did not follow up. Ex. 11, at ¶ 42. He testified that it was not urgent, so he did not press the issue. On cross examination, Camara conceded that Torres might have brought up being placed on the deed but that she could not recall. She could not say that he never brought it up.

Camara testified that she believed that the Agreement would only be effective in the future if Torres was put on the deed. She also testified that the payments that he made into the joint account to divide the mortgage payment and other Property expenses were his contributions as a "tenant" of the Property. When asked on cross examination if she ever had communicated to Torres that the amounts he paid were payments for room and board, Camara could not recall ever having such a communication.

The testimony of Torres was credible and supported by the documentary evidence, including the Agreement. Camara was not credible on critical points. While she attempted to portray the payments by Torres as some form of tenant payment or contribution, her initial bankruptcy schedules did not reflect that characterization. On May 26, 2023, Camara sought to amend her Statement of Current Monthly Income and Statement of Financial Affairs to portray the payments in that way and disclose the payments as income only after Torres asserted rights under the Agreement.

The parties intended that Torres would have an ownership interest in the Property and that the Agreement would memorialize that intention and provide for how Property expenses would be paid, and rights of parties if the expenses were not paid, if the parties broke up, or one of them died.

**Discussion**

The Agreement contemplated that the Property would be owned by the parties as tenants in common; thus, by its terms, the Agreement did not create an express trust when it was executed after the Property was acquired in Camara's name alone. However, the evidence amply supports the imposition of a constructive trust. *See Sullivan v. Rooney*, 404 Mass. 160, 163 (1989) (affirming imposition of constructive trust on property owned by one domestic partner in favor of the other domestic partner finding a fiduciary relationship and unfulfilled promise to place name on deed). "A constructive trust is a flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment." *Maffei v. Roman Catholic Archbishop of Bos.*, 449 Mass. 235, 246 (2007) (citing *Fortin v. Roman Catholic Bishop of Worcester*, 416 Mass. 781, 789 (1994)). "In cases where no express trust exists, a judge may employ the equitable remedies of constructive or resulting trust to avoid injustice to the grantee . . . ." *Id.* at 246 n.23 (citing J.R. Nolan & L.J. Sartorio, Equitable Remedies § 351 (2d ed. 1993)). "A resulting trust is an equitable device, employed to correct a defect in the execution of a transferor's intent." *Lassman v. McQuillan (In re Charles River Press Lithography, Inc.)*, 338 B.R. 148, 160 (Bankr. D. Mass. 2006). "On the other hand, a constructive trust 'is imposed not because of the legally inferred intention of the parties but because the court concludes that the person holding the title to the

property, if permitted to keep it, would profit by a wrong or would be unjustly enriched[']," having acquired the property through fraud, mistake, breach of duty, and the like." *Id.* at 160–61 (quoting Restatement (Third) of Trusts, § 7 cmt. d (2003)) (citing *Fortin*, 416 Mass. at 788).

Here, the evidence demonstrates that Camara intended to own the Property together with Torres as tenants in common. The text messages and actions of the parties are consistent with this intent and the ultimate agreement that, notwithstanding that Camara took title in her name only, the purpose was to give Torres a perceived advantage to finance future real estate acquisitions. It is undisputed that Torres fully performed his obligations under the Agreement until he moved out and the Agreement provided for remedies if the couple's relationship ended. Torres made improvements to the Property and, at all relevant times, the parties spoke of and treated the Property as jointly owned. Camara's testimony that she viewed Torres and his payments as a tenant arrangement was not credible and inconsistent with the Agreement and the weight of the other evidence.[5] The Court finds that, as a result of the intended arrangement of the parties, Camara holds bare legal title to Torres's interest as tenant in common in the Property and Torres's interest is not property of the estate under § 541(d).

Where neither Torres nor Camara were ultimately required to pay any amounts at the time of the acquisition and only Camara became obligated on the loans used to pay the purchase price, it is unclear that a resulting trust could arise. A resulting trust "is a reversionary, equitable interest implied by law in property that is held by a transferee, in whole or in part, as trustee for the transferor or the transferor's successors in interest." *Eaton v. Fed. Nat'l Mortg. Ass'n*, 462 Mass. 569, 577 n.10 (2012) (quoting Restatement (Third) of Trusts § 7 (2003)). "The case is

---

[5] I also find that creditors of the Debtor's estate will not be prejudiced by imposition of constructive trust since the Debtor has claimed her interest in the Property as exempt and the trustee has filed a report of no distribution in the case.

made by showing circumstances which raise a presumption that the person making the transfer or causing it to be made did not intend to give the transferee the beneficial interest in question, and thus that the interest remained in the transferor or payor or his or her estate." Restatement (Third) of Trusts § 7 cmt. a. Courts have imposed resulting trusts where "a transfer of property is made to one person and the purchase price is paid by another; in such a case a trust results in favor of the person who furnished the consideration." *Meskell v. Meskell*, 355 Mass. 148, 150 (1969). Because the facts support imposition of a constructive trust, it is not necessary that I determine whether in this case a resulting trust arose.

### Conclusion

For the reasons above, judgment shall enter in favor of Torres on Count I declaring that Camara holds bare legal title to Torres's interest as tenant in common in the Property and that that interest is not property of the estate. To the extent necessary, Torres may seek relief from the automatic stay to enforce the Agreement in state court. The Court denies the request by Torres for an award of costs and attorney's fees without prejudice.[6]

Dated:  June 20, 2025

By the Court,

_____
Christopher J. Panos
United States Bankruptcy Judge

---

[6] The request is denied without prejudice to Torres filing a timely motion for costs pursuant to Fed. R. Bankr. P. 7054(b)(1), and such motion should specify the grounds for awarding costs, particularly under 28 U.S.C. § 1920. While the basis to depart from the "American Rule" with respect to attorney's fees is not apparent to the Court, *see Madoff v. Amaral (In re Amaral)*, 567 B.R. 417 (Bankr. D. Mass. 2017), the request for attorney's fees is also denied without prejudice to Torres filing a timely motion pursuant to Fed. R. Civ. P. 54(d)(2), as incorporated by Fed. R. Bankr. P. 7054(b)(2)(A).